Allen E. Hill and Mary Jane Hill, Appellees, v. Zale Z. Allabaugh, Appellant, and Mary Jane Hill and Stephen Robert Allabaugh, Appellees.

Gen. No. 10,179.

Opinion filed March 9, 1948.
Released for publication March 30, 1948.

WELSH & WELSH, of Rockford, for appellant; R. T. WELSH, of Rockford, of counsel.

WARD & WARD, of Sterling, for appellees; M. V. HAGANS, of counsel.

MR. JUSTICE BRISTOW delivered the opinion of the court.

This is an appeal from the county court of Whiteside county by Zale Z. Allabaugh from a judgment entered on March 3, 1947. The judgment granted the petition of Allen E. Hill and Mary Jane Hill for the adoption of Stephen Robert Allabaugh, the minor son of appellant and Mary Jane Hill. For sake of brevity, we will

refer hereafter to appellant as Allabaugh, to the appellees as Mary and Allen, and to the son as Stephen.

On December 13, 1946, the petition was filed herein alleging abandonment and desertion of Stephen by his father, Allabaugh. Appellant filed his verified answer denying both desertion and abandonment. The trial court granted the petition, finding, ''That the father of said child is unfit to have said child for the reason of the abandonment of said child on the part of the father, and also desertion of the child by the father for more than six months, next preceding the filing of the petition.''

Whether or not this determination is warranted makes necessary a full recital of facts that have given rise to the controversy between these litigants.

Mary and Allabaugh were married in 1939, and to this union Stephen was born late in 1940. On May 2, 1941, they were divorced, in which proceeding Mary was given the custody of Stephen and Allabaugh was ordered to pay for his support $5 per week. After the divorce, Mary and Stephen lived with her mother, Mrs. Crump, at Sterling, Illinois. Allabaugh continued to live in Sterling with his grandmother, and made his payments for Stephen's support regularly. This condition continued until November 1941, when Allabaugh left Sterling with a friend by the name of Don Frosa for a pleasure trip to California in Don's automobile. It was Allabaugh's intention to return in three weeks. He was a man thirty-one years of age, whose weekly wage was $18. He was not physically strong, having been afflicted with diabetes for thirteen years. He had been examined by the army and declared unfit.

However, soon after arriving in the west, war was declared. In California there were many vital war industries. Allabaugh became interested in preparing himself to render some useful service to his country in the way of war production since his health made him ineligible for active duty. To this end, Allabaugh

received training for about three months to become a skilled motor mechanic in a consolidated parts school for war workers.

After this period of schooling where he received little compensation, and during which time his weekly payments were not paid, he obtained employment on February 26, 1942, with the Rohr Aircraft plant at Chula Vista, California. Sometime in March 1942, Allabaugh resumed making his five dollar payments. Then, soon thereafter, realizing that he was in default, he paid ten dollars per week for a year to Stephen. Upon Allabaugh's arrival in California, he sent Stephen a birthday telegram and card. In May 1943, payments were continued at the rate of five dollars per week, and for Christmas Stephen was sent a military suit. It was during 1943 that Allabaugh was transferred from near San Diego, California to Phoenix, Arizona, where he remained until September 1943. Payments were continued without interruption until May 1944.

On June 30, 1943, Allabaugh was married to a lady in California who by a former marriage had two young children. It appears that after May 1944, Allabaugh's life was beset with many adversities. He was out of employment from May until October 1944 because of a ruptured appendix. His condition during this period was quite critical. It appeared that life for him was hopeless. He was transferred to a hospital in San Diego where his appendix was removed, and where he remained for over two months. This misfortune made it necessary for his second wife to obtain employment, which she did. At the time of the hearing herein, all but $165 of his medical, surgical and hospital expenses had been paid. The initial indebtedness was $748. It also appears that there is a regular item of expense for him for insulin of three dollars a week. During 1946, appellant had dental work done that cost $150. And during that same year, Allabaugh suffered at various

.times, twenty-eight different attacks of boils which resulted from his ruptured appendix, and on each occasion he lost many days work and no pay for those days.

When Stephen was not a year old, appellant took out an educational life insurance policy to defray some of Stephen's educational expenses. This policy is still in force. In the fall of 1943, appellant sent to his father, Russell Allabaugh, $300 in war bonds which were made payable to Stephen upon the death of his father. These, however, were returned to Allabaugh to help defray expenses when sickness and unemployment engulfed him with debts. For Christmas 1944 and 1945, Stephen received from his father $25. Until April 1945, there was regular correspondence between Allabaugh and his first wife. But in April 1945, Mary refused to write him any further about their son. Appellant then relied upon his brother John and father Russell to keep him informed of the welfare of his son. John took Stephen out on many occasions to places of interest and entertainment, took snapshots of him, and as a result, they developed quite an attachment for each other.

The record also discloses that in 1945, Mary became interested in petitioner Allen Hill, whom she married in August 1945. Beginning January 13, 1946, Mary, Allen, and Stephen lived together at 705 Sixth avenue, Sterling, Illinois. Allen appears to be a fine person with an average net income of $5,000 per annum. The record does not disclose any question about the character of any of the parties involved. The petitioners desire to change the name of Stephen Robert Allabaugh to Stephen Robert Hill. Stephen commenced school in the fall of 1946, and was directed to adopt the name last mentioned.

It seems that there is little dispute as to the foregoing recitals with the exception that Mary is not sure that all of the payments were made as contended by her

former husband. Appellee in his brief urges that the following additional facts be given consideration: That Allabaugh between Christmas 1945 and the date of the petition, December 13, 1946, did not send a birthday card nor correspond with Mary concerning the boy; that neither John nor Russell Allabaugh saw the boy during the year 1946; that appellant received a letter from Mary concerning the proposed adoption proceeding and that he simply tore it up in anger; that appellant testified that during 1946 he was employed at $1 per hour but that he sent none for Stephen's support.

It would appear from the record without much question, that the petitioners herein do not have much complaint about appellants' conduct in this matter until 1945. It was then that Mary became interested in her present husband, and told Allabaugh that she would not correspond with him any more. Can Stephen's father be charged with desertion or abandonment because he did not write Mary? Appellant says that he did not intend ever to abandon or desert Stephen and that he was planning on returning to Sterling as soon as his debts were cleared. When he first heard of the adoption proceeding, he called his father and asked him to attend to the matter until he got home.

Two of the grounds for finding a parent unfit under the adoption statute are found under ''e,'' abandonment of the child, and ''f,'' desertion of the child for more than six months next preceding the filing of the petition. (Ch. 4, par. 4—1, Ill. Rev. Stat. 1945 [Jones Ill. Stats. Ann. 19.012(14)].) Abandonment under the adoption statute has been held to mean any conduct on the part of a parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. (*People ex rel. Bowdry v. Bowdry*, 324 Ill. App. 52, 57 N. E. 287.)

The question of the right of adoption is easily distinguishable from the right to custody, and

any court of chancery has jurisdiction to take from the parent the custody of his child in case he or she is found unfit to have it. Custody is one thing; adoption is another. Adoption which changes the course of inheritance, deprives the child of the place in which it was placed by nature, and by force of law, thrusts the child into another relationship, is a very different matter from change of custody. (*People v. Cole*, 238 Ill. App. 413.) A parent has a right to his child against all the world unless he has forfeited that right according to law, or the welfare of the child demands that he be deprived of it, (*Harmon v. Starbody*, 219 Ill. App. 603) and the rights of a natural parent will not be disturbed unless petitioners make out a case by clear and satisfactory evidence.

The many cases cited and reviewed by counsel for appellant and appellee in their very able briefs are so dissimilar to the issues and facts under consideration that we deem it no help to lengthen this opinion with an analysis of them. Much space is devoted to the question as to whether or not there is a real difference between desertion and abandonment. Apparently, appellee took the position in the lower court that even though there had been no abandonment, there was certainly desertion for the period of six months. The case of *In re Petition of Ekendahl v. Topol*, 321 Ill. App. 457, deals with this question and has the following to say: "Under our criminal code, abandonment of a wife has been held synonymous with desertion, (*People v. Seed*, 202 App. 486; *Virtue v. People*, 122 App. 223) but since the adoption act itself distinguishes between abandonment and desertion, those cases cannot aid nor have we been able to find any Illinois case which does. . ." The court in passing upon the issues in that case held that there was no abandonment, and, apparently reached the conclusion that if there was no abandonment there could be no desertion. The legislature, however, having

added the word "abandonment" to the adoption statute, recognized some difference or at least had some reason for making the addition. The court in the *Ekendahl* case had the following to say on the subject of abandonment: "Abandonment imports any conduct on the part of the parent which evinces a settled purpose of foregoing of parental duties and relinquishment of the parental claims to the child. It does not follow that the purpose may not be repented of and, in proper cases, all parental rights then acquired, including that of preventing adoption by withholding consent. . . The idea of relinquishment appears universal in defining the term. The basis for such an idea cannot be found in the evidence here."

■ Appellee Mary makes the contention that appellee Allen is in much better economic position to take care of Stephen's future needs than is his father, and that the welfare of the boy would be well served under his guidance. We are not disposed to give very much weight to this argument. It does appear that Allabaugh does not evidence the greatest promise as a financial success. He found it necessary to borrow money from his father to return from California to present his defense to the petition filed herein. The court in the case of *Cormack v. Marshall*, 211 Ill. 519, 523, had occasion to consider a similar contention, and did so in the following language: ". . . The mere fact that some other person may have more money or property in any form is not one that appeals to us, The Divine injunction to multiply and to replenish the species was not confined to the rich, nor was it intended that the poor should beget the children and the rich should rear them. To recognize such a doctrine would be little less than monstrous, and would be in utter disregard of those natural instincts of love and care and interest found in the breast of the parent. And while it is said in the books that the interests of the child is the controlling question, it is not meant thereby

to say that the financial interests only of the child should predominate. . . ."

There is nothing in the record that would indicate but what Stephen's father is a fine young man. The conclusion seems to us as completely irresistible that he has been guilty of neither abandonment nor desertion for any period. It is only fair that we view Allabaugh's actions and conduct from beginning to end, and, when the over-all picture is viewed, we think his devotion, attention, and interest in his boy has been most unusual. In reviewing the evidence, we find that since he left Sterling in 1941, his life has been replete with experiences that were most distracting and upsetting. First it was war and his preparation for war work; then sickness, hospitalization, unemployment, indebtedness, boils, more unemployment, and impoverishment to the point that his second wife was compelled to go to work. But through all this succession of misfortune and adversity, he never lost interest in his son. To the contrary we find he sent his payments when able; he sent Christmas presents throughout; he provided for Stephen's education in an insurance policy; he subscribed for war bonds for the boy; he wrote to Stephen's mother regularly about him until she no longer saw fit to communicate with him. The evidence of his unfitness must be clear and satisfactory. We believe the lower court was in error in conceiving it to be such.

Cause remanded to the county court with directions to deny the petition for adoption.

*Reversed and remanded.*