In re Adoption of Peters: Peters et al., Appellees, *v.* Jones, Appellant.*

(No. 5356—Decided January 9, 1961.)

*Mr. Clarence G. Smith*, for appellees.
*Mr. Harland M. Britz*, for appellant.

Smith, J.   This is an appeal on questions of law from a decree of adoption by the Probate Court of Lucas County upon the petition of General Peters and Mary Fannie Peters, husband and wife, for the adoption of Joann Glaze, the minor child of Mary Ann Glaze.   The mother is the appellant herein and the petitioners are the appellees.

The petition for adoption was filed on August 14, 1959.   It alleges that the petitioners are husband and wife, having been married on February 13, 1934, in Lafayette, Alabama, and now

*Motion to certify the record overruled, April 26, 1961.

residing in Toledo, Ohio; that Joann Glaze was born on October 18, 1954, at Opelika, Alabama, and is a grandniece of petitioner Mary Fannie Peters; that the sole living parent of such minor child is Mary Ann Glaze, the mother, who lives in Toledo, Ohio; that the child was placed in the home of petitioners on July 10, 1955; that the mother agreed to do all things necessary to permit petitioners to adopt the child; and that, since July 10, 1955, and thereafter, the mother has willfully failed to contribute substantially to the support of the child and refused to consent in writing or appear in open court and give her consent to the adoption.

The essential facts in the record reveal that petitioner Mary Fannie Peters has lived in Toledo for nine years with her husband and is the mother of four children, two of which are living at home; that she saw Joann Glaze for the first time in July 1955, at Opelika, Alabama, when petitioner was visiting her mother; that Joann was living with her mother across the street; that petitioners visited with Mary Glaze and Joann; that Mary Glaze told her she was not financially able to care for Joann, then seven or eight months old; that the mother said: "You can just have her anyway to help me out, because I can't make it with two babies"; that petitioner told her the only way she would take her was through adoption; that in four or five days thereafter petitioner brought Joann to their home in Toledo, the mother remaining in Alabama; that the petitioner General Peters also talked with Mary Glaze relative to adoption of Joann; that the mother said: "I'll sign the adoption papers whenever you're ready"; that the mother, who was not working, lived in the home of the petitioners for about three or four months at their request when Joann had a second operation in Toledo; that the mother has not contributed or provided anything to the support of the child since the child has lived with petitioners; and that the mother now lives about eight or nine blocks from petitioners. On cross-examination, this petitioner was asked: "You never expected Miss Glaze, here, to contribute anything to the support did you," and she answered: "No, because she gave her to me, and I didn't think I was supposed to ask for any." And this petitioner never asked the mother for any support. The mother, in the summer of 1960, after the

petition for adoption had been filed, told petitioner that she wanted the child. She was asked: "Did you tell her that if she was to pay you all the money, that you had paid out over the years for the child, that then you would be willing to let Miss Glaze have the child back." She answered: "No, I wouldn't be willing to have her to pay back all the money we paid out on it," and "that [the statement] was made when I first had taken her. She would have to pay me for washing diapers, because I didn't like to wash diapers."

The petitioner General Peters testified that he has worked at Martin Box Factory in Toledo for nine years; that two operations were had on Joann costing him $600; that nothing was paid by the mother; that the mother hasn't contributed anything for the care of the child; that he told the mother he wanted to adopt the child and the mother said: "All right, go ahead and I'll do it after while"; and that he told her: "Well, I can't do nothing. All I can do is take her and be a father to her * * *. I'm going to take care of her."

The court was advised by the mother's counsel that the child was illegitimate and that the mother has since married. The court remarked that "The mother has a great right to the child, whether it was born in, or without wedlock. The people [referring to petitioners] are the salt of the earth. The petitioners have had this child for some time * * *. Now we are here on the issue of willful failure to support. I don't think the word 'willful' means anything terrific, except that it is an intentional failure to support. * * * "I find that there is intentional failure to support these two years."

There followed the testimony of the mother relating that when petitioners visited in Alabama she discussed her situation and how her job was going; that she told her how much she was making, and the petitioner offered to bring up the child and help her out and the understanding was that when she would find help for her children and would be able to support Joann that she wanted her back and petitioner took the child in July, 1956; that she didn't agree in any way to sign a consent to adoption; that she came to Toledo in 1957 when petitioner sent for her because the baby was sick, and she stayed with petitioner for 3½ months; that she could find no permanent work but did

house cleaning at irregular times and made about $17 for three days' work; that she went to live with her sister and married Mr. Jones on September 9, 1959; and that about a year after leaving the Peters' home she asked the petitioners on three occasions to have Joann back. She was asked: "Did they tell you that she would let you have the child on any conditions?" She answered: "If I'd give them the money for the time they had her and 'I told them I couldn't afford to pay her all the money.'" On cross-examination, she was asked if she made any contribution during the last three years to the expense of the operation on Joann. She answered: "No, they didn't ask me." She was asked: "Of course, at the time of the operation you didn't have any money, did you?" She answered: "No, I didn't."

Appellant assigns as error that the finding by the Probate Court that she willfully failed to properly support and maintain the child for a period of more than two years immediately preceding the filing of the petition is against the manifest weight of the evidence and contrary to law.

Adoption was not recognized by the common law. It is, therefore, solely a creature of statute and as a consequence subject to the rule of strict construction. *Sommers* v. *Doersam*, 115 Ohio St., 139, 148, 152 N. E., 387; *In re Adoption of Todhunter*, 33 Ohio Law Abs., 567, 35 N. E. (2d), 992; *In re Adoption of Wedl*, 65 Ohio Law Abs., 231, 114 N. E. (2d), 311. Those parts of the Revised Code pertinent to the instant case are as follows:

Section 3107.06. "No final decree or interloctory order of adoption shall be entered by the Probate Court unless there is filed with the court written consents to the adoption, verified or acknowledged by the following:

"* * * *

"(B) By each of the living parents, adult or minor, except as follows:

"(1) The mother of an illegitimate child shall be considered for the purpose of this section the sole parent and may give consent alone, in which case the consent shall state that it is given by the mother as the sole parent. * * *

"* * * *

"(4) If it is alleged in the petition that one or both of the parents have willfully failed to properly support and maintain the child for a period of more than two years immediately preceding the filing of the petition, the court shall cause notice of the filing of said petition and the allegations of such failure to be given to such parents as provided in Sections 2101.26 to 2101.28, inclusive, of the Revised Code. After such notice has been given, the court shall determine the issue as to such failure to properly support and maintain the child. The consent of a parent found by the court to have willfully failed to properly support and maintain the child for such a period shall not be required."

The single statutory issue as we see it is whether there is any substantial evidence in this case that the mother of the child born out of lawful wedlock has willfully failed to properly support and maintain her child for two years immediately prior to the filing of a petition for adoption, so as to excuse the mandatory requirement of consent by the mother.

The ultimate facts as disclosed by the record are not in dispute. An analysis of the evidence on the determinative issue before this court shows that the mother did not willfully fail to properly support and maintain the child for two years prior to the filing of the petition for adoption. Stated affirmatively, the record contains no substantial evidence of willful failure to properly support and maintain the child.

Evidence merely that the mother paid nothing to the petitioners for the support of the child does not establish "willful failure" to support. Nor can any inference be drawn therefrom to that effect, in view of the positive evidence that the mother was not financially able to contribute to the support of the child and the petitioners, with whom the child was placed, never requested or expected any assistance, payment or contribution by the mother for such support.

Arrangements were voluntarily made for the petitioners to take the child and care for it in their home because of the mother's then financial situation and the care of the second child. The mother anticipated the time when she could care for the child and made three requests for return of her child when her circumstances improved.

No discussion was had concerning payment of support by petitioners who were physically and financially able to support the child. There was some talk of adoption in the future, but no conclusion was reached on that point.

We agree with the Probate Court that petitioners' care and attention was admirable and commendable, but this in itself does not control the determination of the question of willful failure of the mother to properly support and maintain her child. Furthermore, the consideration of the best interests of the child, incident to custody proceedings, is not germane to the issue here of establishing the statutory alternative for requisite consent of the mother.

The foregoing analysis of the evidence and the law applicable to the statute as it is now amended is supported by the following cases, recognizing, of course, variation in fact which would dictate different results:

*In re Adoption of Wedl, supra* (65 Ohio Law Abs., 231); *In re Adoption of Baker,* 100 Ohio App., 146, 136 N. E. (2d), 147; *Poet* v. *Rosinski,* 60 Ohio Law Abs., 513, 102 N. E. (2d), 19, appeal dismissed 155 Ohio St., 510, 99 N. E. (2d), 320; *In re Adoption of Shaw,* 91 Ohio App., 347, 108 N. E. (2d), 236; *In re Adoption of DeVore,* 111 Ohio App., 1, 167 N. E. (2d), 381.

Counsel for petitioners cites *In re Adoption of Biddle,* 168 Ohio St., 209, 152 N. E. (2d), 105. We see nothing in that case contrary to our conclusion in the instant case. The evidence in the *Biddle case* is of a different character and effect.

In the case of *In re Adoption of Wedl, supra,* Probate Court Judge Ziegel made an exhaustive review of the adoption statutes of Ohio, tracing the history of this legislation down to the present time. He stated:

"* * * Adoption statutes, being in derogation of the common law which does not recognize adoption, should be strictly construed. While the language of the present act permits more latitude in determining when the rights of parents to their child have been lost so that their positive consent to an adoption of that child by another is not required, it does not open the door completely. The word 'willfully' still appears to require a showing of something more than a simple failure properly to support and maintain. 'Willful' has been defined by Ohio courts

in other types of cases where the word is used in a statute, and a summary of these decisions indicates that the closest synonym is 'intentional' or 'an intentional omission of a duty.'"

Also, in the case of *In re Adoption of Shaw, supra* (91 Ohio App., 347), the word "willfully" as used in the statute pertaining to adoption was construed to mean intentional as distinguished from accidental or involuntary. The facts and circumstances of the case before this court do not place the mother under the definition as stated in the *Biddle case, supra*, where on page 217 it is said:

"* * * When a parent, knowing of his duty to support and being able to provide such support, voluntarily and intentionally fails to do so, such parent may be found to have 'willfully failed' within the meaning of the statute. * * *"

In the case of *In re Adoption of DeVore, supra*, two members of this court participating, it is stated:

"Under our form of civilization we feel that the parents have a paramount right to their children, and will be deprived of neither the rights or obligations entailed without the strongest of reasons."

Thus, the rule of strict construction of the statute is salutary and benevolent.

There being no substantial evidence of willful failure to properly support and maintain the child, the mother is entitled to judgment in her favor, and the judgment of the Probate Court is contrary to law. This court, confronted with the summary and salutary principle as is authorized by Section 2505.37, Revised Code, renders the judgment which the Probate Court should have rendered, and hereby enters final judgment dismissing the petition for adoption. See *Barton* v. *Paratore*, 68 Ohio Law Abs., 125, 121 N. E. (2d), 298.

This cause is remanded to the Probate Court with instructions to certify this cause to the Juvenile Court of Lucas County, Ohio, in which county the child is residing, for appropriate action and disposition as required by Section 3107.12, Revised Code. See *State, ex rel. Clark,* v. *Allaman, Supt.*, 154 Ohio St., 296, 95 N. E. (2d), 753.

*Judgment accordingly.*

Fess and Deeds, JJ., concur.